UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                               :

FTI CONSULTING, INC.,                        :

                               :

                     Plaintiff,          :

                               :         21 Civ. 4847 (JPC)

         -v-                        :

                               :           OPINION

REGIONAL HEALTH PROPERTIES, INC.,     :    AND ORDER

                               :

                  Defendant.      :

                               :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      This case turns on the proper interpretation of a contract governing the consulting services

that Plaintiff FTI Consulting, Inc. ("FTI") provided to Defendant Regional Health Properties, Inc.

("Regional Health").  FTI claims that Regional Health is obligated to pay the remainder of the fees

it believes to be due under the contract.  Regional Health denies that any additional fees are due,

both because the contract is unenforceable and because the terms of the contract, for various

reasons, require no fees to be paid in the present circumstances.  Furthermore, Regional Health

claims that because the contract does not obligate it to pay any fees, it is entitled to reimbursement

for a payment it had already made to FTI.  FTI now moves for summary judgment both on its

claims and on Regional Health's counterclaims.  Because the Court agrees both with FTI's view

that the contract is enforceable and with its interpretation of the contract, FTI's motion for

summary judgment is granted.

## I. Background

### A. Facts[1]

Regional Health is a holding company that leases or owns properties used as facilities for senior living and long-term care.  Pl. 56.1 Stmt. ¶ 2; Dkt. 31-1 ("Morrison Dep. Tr.") at 18:7-16, 19:20-25.  Regional Health does not ordinarily hold those properties on its own books; instead, each property is legally owned or leased by a wholly owned subsidiary of Regional Health.  Pl. 56.1 Stmt. ¶ 2; Morrison Dep. Tr. at 18:7-22; Dkt. 31-4 ("Waites Dep. Tr.") at 19:21-24.  One such subsidiary is ADK Georgia, LLC ("ADK").  Pl. 56.1 Stmt. ¶ 4; Morrison Dep. Tr. at 18:3-6.  ADK leased a facility located at 3223 Falligant Avenue, Thunderbolt, Georgia (the "Tara Facility"), Pl. 56.1 Stmt. ¶ 5; Dkt. 31-6 ("Tara Sublease"), and a facility located at 3460 Powder Springs Road, Powder Springs, Georgia ("Powder Springs Facility"), Pl. 56.1 Stmt. ¶ 5; Dkts. 31-7 to 31-8 ("Powder Springs Sublease").  The Tara Facility was subleased from ADK by 3223 Falligant Avenue Associates, L.P. ("Tara Tenant"), Pl. 56.1 Stmt. ¶ 5; Tara Sublease, and the Powder Springs Facility was subleased from ADK by 3460 Powder Springs Road Associates, L.P. ("Powder Springs Tenant"), Pl. 56.1 Stmt. ¶ 6; Powder Springs Sublease.  Each facility was subleased from ADK pursuant to subleases guaranteed by Wellington Healthcare Services II, L.P., Pl. 56.1 Stmt. ¶ 7; Dkt. 31-26 at 4.  During April 2020, the Tara Tenant and the Powder Springs

---

[1] The following facts are drawn primarily from FTI's statement of material facts under Local Civil Rule 56.1, Dkt. 32 ("Pl. 56.1 Stmt."), Regional Health's counter-statement of material facts and statement of additional material facts in support of its counterclaims, Dkt. 37 ("Deft. 56.1 Counter-Stmt."), FTI's counter-statement of additional material facts in response to Regional Health's statement of additional material facts, Dkt. 39 ("Pl. 56.1 Counter-Stmt."), and the exhibits filed by the parties.  Unless otherwise noted, the Court cites to only FTI's Rule 56.1 Statement where the parties do not dispute the fact or Regional Health simply seeks to add its own "spin" on the facts or otherwise disputes the inferences from the stated fact.

Tenant (together, the "Wellington Tenants") both stopped paying rent to ADK under their respective subleases.  Pl. 56.1 Stmt. ¶ 8; Dkt. 31-13.

FTI is a consulting firm that provides restructuring services, among others.  Pl. 56.1 Stmt. ¶ 1.  Presently, Rick Arrowsmith is a Senior Managing Director in FTI's restructuring practice. *Id*; Dkt. 31-2 ("Arrowsmith Dep. Tr.") at 8:9-13.  In August 2020, Regional Health sought to retain Arrowsmith to help resolve the outstanding issues at the Tara Facility and the Powder Springs Facility (together, the "Wellington Facilities") by negotiating a transfer of the Wellington Facilities from the Wellington Tenants.  Pl. 56.1 Stmt. ¶ 9; Arrowsmith Dep. Tr. at 17:19-19:4; Morrison Dep. Tr. at 34:15-23.  At that point, Arrowsmith was not yet employed by FTI.  Pl. 56.1 Stmt. ¶ 10; Arrowsmith Dep. Tr. at 17:19-21.  Shortly after being engaged by Regional Health, Arrowsmith joined FTI as a consultant.  Pl. 56.1 Stmt. ¶ 13; Arrowsmith Dep. Tr. at 17:22-25.  Subsequently, on August 21, 2020, Regional Health entered into an agreement (the "Letter of Engagement") with FTI, Arrowsmith's new employer, in order to retain Arrowsmith to work on the transfer of the Wellington Facilities.  Pl. 56.1 Stmt. ¶¶ 14-15; Morrison Dep. Tr. at 35:24-36:13; Dkt. 31-11 ("LOE").  The Letter of Engagement, which was drafted on FTI's letterhead, was signed by Arrowsmith on behalf of FTI and addressed to Regional Health's President, Brent Morrison, who also signed the letter confirming its terms.  *See* LOE.

The Letter of Engagement sets forth both the services that FTI was to perform for Regional Health and the compensation that Regional Health was to pay in exchange.  First, the section entitled "Scope of Services" specifies:

> The Services, to be performed at [Regional Health's] direction, are expected to include the following:
>
> - Tenant/Operator transfer support;
> - Restructuring Services

*Id.* § 2.  But, it adds, "[t]he Services, as outlined above, are subject to change as mutually agreed between us."  *Id.*  In addition, it clarifies that "FTI is engaged by [Regional Health] to provide financial advisory and consulting services only.  Accordingly, while [FTI] may from time to time suggest options which may be available to [Regional Health] and further give [FTI's] professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with [Regional Health], its management and board of directors."  *Id.*  The section entitled "Fees and Cash on Account" then specifies that "[a]s compensation for the services of the Senior Officers and any Additional Personnel, FTI shall be entitled to a success fee in the amount of 7.5% of the collection of any now due or in the future due and/or past due lease payments under the Wellington leases."  *Id.* § 3.  Finally, the section entitled "Terms and Conditions" includes a merger clause that provides:

> [T]his letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

*Id.* § 4.

Once the Letter of Engagement was executed, Arrowsmith entered into negotiations with Jeff Andrews, the President of Wellington Healthcare.  Pl. 56.1 Stmt. ¶¶ 19-20; Dkt. 31-12 ("Morrison E-mail"); Arrowsmith Dep. Tr. at 58:10-59:8; Morrison Dep. Tr. at 65:21-69:8. Following those negotiations, with the assistance of counsel, ADK and various other entities, which were collectively referred to as the "Wellington Parties," entered into an agreement (the "Agreement Regarding Leases") effective December 1, 2020, to resolve the dispute over the

Wellington Facilities.  Pl. 56.1 Stmt. ¶¶ 22-24; Dkt. 31-17 ("Agreement Regarding Leases").[2]  In addition, on December 1, 2020, the Wellington Tenants each executed an Operations Transfer Agreement to transfer control of the Wellington Facilities.  Pl. 56.1 Stmt. ¶¶ 25-26; Dkts. 31-18 to 31-19.  In the Agreement Regarding Leases, the Wellington Tenants agreed to transition the Wellington Facilities to ADK or its designee on January 1, 2021.  Agreement Regarding Leases § 2.  Furthermore, the Wellington Tenants agreed that on the date of the transition of the Wellington Facilities they would pay all cash on hand at the facilities to ADK and would further assign to ADK all accounts receivable outstanding as of that date.  Pl. 56.1 Stmt. ¶ 27; Agreement Regarding Leases § 4.  In exchange, ADK agreed "to forbear pursuit of its rights and remedies" under its leases and other agreements with the Wellington Tenants.  Agreement Regarding Leases § 8.  The Agreement Regarding Leases permitted ADK to cease that forbearance, however, if the Wellington Tenants failed to perform under the Agreement Regarding Leases for ten business days following written notice of such failure, if either Tenant instituted a bankruptcy or other insolvency proceeding, or if the Wellington Facilities were not transitioned by February 28, 2021.  *Id.* §§ 8, 10.  Furthermore, ADK agreed to indemnify the Wellington Tenants for the unpaid balance of "Nursing Home Provider Fees," commonly called "bed taxes."  *Id.* § 6; Pl. 56.1 Stmt. ¶ 29.

Following the execution of the Agreement Regarding Leases, FTI and Regional Health were unable to agree as to what fee was owed to FTI.  Pl. 56.1 Stmt. ¶¶ 30-35; Dkts. 31-20 to 31-28.  In an attempt to avoid litigation and resolve the dispute, on April 15, 2021, Morrison sent FTI a check for $83,841.00.  Dkt. 31-42.  Pl. 56.1 Stmt. ¶ 39; Dkt. 34 ("Deft. Opp.") at 22 ("[Regional Health] sent a payment in the hopes of settling the case . . . ."); Morrison Dep. Tr. at 134:23-24 ("I

---

[2] FTI's 56.1 statement incorrectly asserts that the Agreement Regarding Leases was effective as of December 31, 2021.  Pl. 56.1 Stmt. ¶ 24.  The Agreement itself, however, states that it is effective as of December 1, 2020.  Agreement Regarding Leases at 1.

was trying to preserve a relationship."); Waites Dep. Tr. at 21:22-22:6.  By the end of May 2021, the total cash collected pursuant to the Agreement Regarding Leases was $3,123,583.18.  Pl. 56.1 Stmt. ¶ 27; Dkt. 31-45; Waites Dep. Tr. at 29:11-14.

## B. Procedural History

FTI filed the Complaint that initiated this action on June 1, 2021, asserting a single count of breach of contract, and seeking the balance of its success fee, which it computes as equaling 7.5% of the total cash collected under the Agreement Regarding Leases minus the payment already made to FTI by Regional Health.  Dk. 1 ("Compl.") ¶¶ 18-22 at 4.  Regional Health answered the Complaint on August 6, 2022.  Dkt. 14 ("Answer").  In its Answer, Regional Health denied that it had breached the contract.  *Id.* ¶¶ 18-22.  If further raised eight "affirmative defenses": (1) the Complaint failed to state a claim upon which relief may be granted; (2) the Letter of Engagement is void for vagueness and too indefinite to be enforced; (3) the Letter of Engagement is ambiguous and therefore unenforceable; (4) FTI breached the contract and therefore may not assert a breach of contract claim; (5) FTI is estopped from suing for breach of contract because its conduct affirmed that the parties were not acting in accordance with the Letter of Engagement; (6) FTI's "claims are barred by the doctrine of waiver"; (7) FTI's breach of contract claim is barred by the failure of the anticipated consideration; and (8) FTI failed to satisfy conditions precedent necessary for its recovery under the Letter of Engagement.  *Id.* at 1-2.  In addition, Regional Health raised four counterclaims.  *Id.* at 6-18.  As subsequently amended, those counterclaims seek the return of Regional Health's April 15, 2021 payment of $83,841.00 on four different theories, two based on unjust enrichment, Dkt. 17 ("Am. Counterclaims") ¶¶ 35-52, one based on breach of contract, *id.* ¶¶ 53-63, and one based on restitution, *id.* ¶¶ 64-69.  In addition, Regional Health seeks reimbursement for its attorneys' fees.  *Id.* ¶ 70.

On February 9, 2022, following the close of discovery, FTI moved for summary judgment on its claims and Regional Health's counterclaims.  Dkts. 30-33.  Regional Health opposed on March 2, 2022, Dkts. 34-37, and FTI replied on March 9, 2022, Dkts. 38 ("Pl. Reply"), 39.

## II.  Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets it initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must

offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).

## III. Discussion

Both FTI's sole claim against Regional Health and Regional Health's four counterclaims against FTI turn on the validity and interpretation of the Letter of Engagement. FTI claims that the Letter of Engagement obligates Regional Health to make an additional payment of fees. Compl. ¶ 21. In turn, Regional Health claims, on a variety of different grounds, that the Letter of Engagement does not require it to make any payment at all; thus, it has no obligation to make any further payment, Answer at 11-12, and it is further entitled to reimbursement of the payment it has already made because no obligation to make that payment existed, Am. Counterclaims at 14. The Court agrees with FTI that the Letter of Engagement is a valid contract, that FTI performed its obligations under that contract, and that Regional Health breached that contract by failing to pay the additional fees that FTI demands. Thus, the Court will grant FTI's motion for summary judgment on its sole claim in this action. And because Regional Health's counterclaims turn on the same questions of contract interpretation as FTI's claim does, the Court's grant of summary

judgment to FTI on its claim requires a corresponding grant of summary judgment in favor of FTI on Regional Health's counterclaims.

## A. FTI's Claim for Breach of Contract

Because the diversity of the parties is the basis for the Court's jurisdiction over this suit, the Court must resolve the parties' dispute in accordance with New York law. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The Letter of Engagement provides that it "shall be governed by and interpreted in accordance with the laws of the State of New York." LOE Standard Terms and Conditions § 7.1. And "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 922 (N.Y. 2015); *accord Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 91-93 (explaining how, under *Ministers & Missionaries*, New York law requires courts simply to enforce choice-of-law clauses rather than conducting an independent choice-of-law analysis). Thus, the Court will employ New York law to resolve both FTI's claim for breach of contract and Regional Health's various counterclaims for the return of its April 15, 2021 payment to FTI. Under New York law, the elements of a claim for breach of contract are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Markov v. Katt*, 109 N.Y.S.3d 295, 296 (App. Div. 2019) (internal quotation marks omitted). The Court will consider each in turn. Furthermore, "[u]nder New York law the initial interpretation of a contract is a matter of law for the court to decide." *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2020) (internal quotation marks omitted). Thus, in determining whether FTI has proven the elements of its claim, the Court will interpret the Letter of Engagement as a matter of law.

### 1.  The Existence of a Contract

Regional Health concedes that it executed the Letter of Engagement with FTI.  Answer ¶ 19.  This display of mutual assent constitutes the meeting of the minds necessary to form a binding contract.  *See Stonehill Cap. Mgmt., LLC v. Bank of the West*, 68 N.E.3d 683, 689 (N.Y. 2016) ("To form a binding contract there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citations and internal quotation marks omitted)).  Nonetheless, Regional Health denies the existence of a valid contract on the grounds that the Letter of Engagement is too indefinite to be enforceable, particularly because of four undefined terms found within it.  Deft. Opp. at 8-13.  Because for reasons that follow none of these four terms are sufficiently indefinite to render the contract unenforceable, the Letter of Engagement is a valid and binding contract.  Consequently, the first element of FTI's claim for breach of contract is satisfied.

As Regional Health argues, unless "an agreement is . . . reasonably certain in its material terms, there can be no legally enforceable contract."  *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989).  The law of contracts aims to enforce bargains entered into by the parties, but for a court "to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981).  If a court sought to enforce a contract lacking such certainty or specificity, the court "in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves."  *Id.*; *see also* Restatement (Second) of Contracts § 33 cmt. b ("[C]ontracts should be made by the parties, not by the courts, and hence . . . remedies for breach of contract must have a basis in the agreement of the

parties."). But the New York Court of Appeals "has not applied the definiteness doctrine rigidly." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 105 (N.Y. 1991). For, as that court has recognized, "[c]ontracting parties are often imprecise in their use of language, which is, after all, fluid and often susceptible to different and equally plausible interpretations." *Id.* Because language inherently contains some degree of indefiniteness, "[a] strict application of the definiteness doctrine could actually defeat the underlying expectations of the contracting parties" by preventing enforcement of a bargain intended by the parties to be legally enforceable. *Id.* at 105-06. Thus, since "parties . . . should be held to their promises[,] . . . courts should not be pedantic or meticulous in interpreting contract expressions." *Cobble Hill Nursing Home, Inc.*, 548 N.E.2d at 206 (internal quotation marks omitted). Instead, "[t]he conclusion that a party's promise should be ignored as meaningless 'is at best a last resort.'" *Id.* (citing *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*, 133 N.E. 370, 371 (N.Y. 1921)).

In order to justify holding a contract unenforceable, then, "[i]ndefiniteness must reach the point where construction becomes futile." *Heyman Cohen & Sons., Inc.*, 133 N.E. at 371. If, instead, an agreement can "be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear," the court should enforce it. *Cobble Hill Nursing Home, Inc.*, 548 N.E.2d at 206. None of the four undefined terms that Regional Health cites as a basis for the invalidity of the contract is so indefinite that construction would be futile, for even when the contract itself does not make their meaning clear, an extrinsic standard is available to render the parties' agreement reasonably certain. The Court therefore holds the Letter of Engagement to be a valid, enforceable contract, satisfied that in so doing it would be "implement[ing] . . . a bargain to which [the parties] have mutually committed themselves," not "imposing its own conception of

what the parties should or might have undertaken." *Joseph Martin, Jr., Delicatessen, Inc.*, 417 N.E.2d at 543.

### a. The Scope of Work

First, Regional Health claims that the Letter of Engagement is unenforceable because it does not define the scope of work required of FTI under the contract.  Deft. Opp. at 9-10.  In particular, it argues, although the Letter of Engagement specifies that "[t]he Services, to be performed at [Regional Health's] direction, are expected to include the following: [1] Tenant/Operator transfer support; [and 2] Restructuring Services," LOE § 2, neither the term "Tenant/Operator transfer support" nor the term "Restructuring Services" is defined.  Deft. Opp. at 9-10.  Furthermore, it argues this definition of the scope of work is contradicted by a subsequent provision that "FTI is engaged by [Regional Health] to provide financial advisory and consulting services only." *Id.*  The Court rejects both these arguments.

Certainly, the Letter of Engagement does not exhaustively detail the services that FTI agreed to provide to Regional Health.  But New York courts have enforced contracts that provided similarly broad descriptions of the professional services to be provided under the contract.  In *Res Exhibit Services, LLC v. Genesis Vision, Inc.*, 64 N.Y.S.3d 786 (App. Div. 2017), the Appellate Division of New York Supreme Court considered a contract that obligated an exhibition-services firm to provide all services and deliverables for an optical-equipment company's exhibits at four upcoming trade shows but left the exact price and scope of work to be subsequently negotiated in a Project Authorization Form executed for each show.  *Id.* at 789.  As the Appellate Division recognized, "a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Id.* at 790 (quoting *Joseph Martin, Jr., Delicatessen, Inc.*, 417 N.E.2d at 543) (cleaned up).  But "a contract is not necessarily lacking in all effect merely because it expresses

the idea that something is left to future agreement." *Id.* at 791 (quoting *May Metro Corp. v. May Oil Burner Corp.*, 49 N.E.2d 13, 15 (N.Y. 1943)).  Instead,

> [w]here the parties have completed their negotiations of what they regard as essential elements, and performance has begun on the good faith understanding that agreement on the unsettled matters will follow, the court will find and enforce a contract even though the parties have expressly left these other elements for future negotiation and agreement, if some objective method of determination is available, independent of either party's mere wish or desire.  Such objective criteria may be found in the agreement itself, commercial practice or other usage and custom.

*Id.* (quoting *Metro-Goldwyn-Mayer v. Scheider*, 360 N.E.2d 930, 931 (N.Y. 1976) (per curiam)); *see also* Restatement (Second) of Contracts § 33 cmt. a ("An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties.").

Applying these principles, the Appellate Division found that the exhibition-services contract was sufficiently definite to be enforceable even though the precise scope of work to be performed and the price were not specified under the contract itself but rather were left to be determined by subsequent agreement between the parties.  *Res Exhibit Servs., LLC*, 64 N.Y.S.3d at 791; *see also AP Links, LLC v. Global Golf, Inc.*, No. 08 Civ. 3602 (TCP) (AKT), 2010 WL 11629613, at *6 (E.D.N.Y. Oct. 4, 2010) (finding an "agreement to supply consulting services on a part-time, as available basis, with no further detail" to be sufficiently definite to be enforced"). The parties, the court found, intended themselves to be bound by the contract they executed.  *Res Exhibit Servs., LLC*, 64 N.Y.S.3d at 791.  And their history of engaging in similar transactions, when combined with the agreement itself, provided the objective criteria required to make sufficiently clear both the scope of work expected at future trade shows and the price to be paid for those services.  *Id.* at 792.

As with the contract the Appellate Division analyzed in *Res Exhibit Services,* the Letter of Engagement was sufficiently definite for the contract to be enforceable.  Like the agreement in *Res Exhibit Services*, the Letter of Engagement did leave some matters to be determined in the

future.  Although the services FTI was to deliver are described as including "Tenant/Operator transfer support" and "Restructuring Services," the Letter of Engagement also provides that "[t]he Services, as outlined above, are subject to change as mutually agreed between us."  LOE § 2. Furthermore, the Letter of Engagement specifies that those services were "to be performed at [Regional Health's] direction," thereby indicating that the precise actions FTI was to undertake in providing its services would subsequently be determined by Regional Health.  *Id.*  Nonetheless, in the New York Court of Appeals's words, "a contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement."  *May Metro Corp.*, 49 N.E.2d at 15.  Instead, when "performance has begun on the good faith understanding that agreement on the unsettled matters will follow," the contract will be enforced "if some objective method of determination is available," which "may be found in the agreement itself, commercial practice or other usage and custom."  *Metro-Goldwyn-Mayer*, 360 N.E.2d at 931.

The principle set forth in *Metro-Goldwyn-Mayer* requires this Court to enforce the Letter of Engagement.  FTI began performance under the contract based on a good faith understanding that any subsequent modifications to or refinements of the scope of work would be determined by subsequent agreement between the parties.  *See* Deft. 56.1 Counter-Stmt. ¶¶ AF21-AF22; Arrowsmith Dep. Tr. at 24:12-18 ("Q.  [W]hat you're basically telling me is the way this is drafted it's intended to give your client the room to ask you to do work in addition to what you originally discussed?  A.  I think that's right.").  Thus, the Court must enforce the contract so long as "some objective method" is available to determine certain FTI's obligations under the Letter of Engagement.  And, in the Court's view, Arrowsmith's course of dealing with Regional Health constitutes the "commercial practice or other usage and custom" rendering FTI's obligations reasonably clear.  *Metro-Goldwyn-Mayer*, 360 N.E.2d at 931; *see also* Restatement (Second) of

Contracts § 33 cmt. a ("An offer which appears to be indefinite may be given precision by . . . course of dealing between the parties.").

The Letter of Engagement required FTI to provide Regional Health with two kinds of services: tenant/operator transfer support and restructuring services.   And Arrowsmith had previously worked with Regional Health, providing similar consultation and advice in connection with a prior transition of a nursing home operator that arose in the context of a breach of a loan agreement.  Arrowsmith Dep. Tr. at 12:13-16; Morrison Dep. Tr. at 24:16-25:10; Morrison E-mail at 2 ("Rick is very experienced in transitioning nursing home operators and we have engaged his team to help us in prior transitions . . . ."); Dkt. 31-5 at 2 (describing the "Arrowsmith magic" Morrison had witnessed in prior dealings with Arrowsmith).  Thus, as in *Res Exhibit Services*, the parties' past transaction enabled the Letter of Engagement to identify reasonably clearly the general type of services FTI had been hired to provide, particularly given each party's familiarity with the sort of transaction about which FTI was retained to provide advice.  And it provided a methodology by which to make definite the specific actions FTI would be obligated to undertake, since FTI's services were "to be performed at [Regional Health's] direction."  LOE § 2; *see also AP Links, LLC*, 2010 WL 11629613, at *6 ("[T]he 'when' is described—upon [the client]'s request for consulting services, [the consultant] was required to provide them . . . .  As to the missing 'how,' the 'how' is not material, and would depend on the specific type of request Global made. (citation omitted)).  Taken together, the agreement and this past conduct identify reasonably clearly the services FTI was to provide under the contract—namely, whenever Regional Health directed it to do so, FTI was to provide consultation and advice of the very same type that Arrowsmith had provided in his previous work with Regional Health.

Because those past services make FTI's obligations reasonably certain, the Court need not turn to the "last resort," *Heyman Cohen & Sons*, 133 N.E. at 371, of refusing to enforce the contract.  To be sure, Arrowsmith's single past collaboration with Regional Health is not the most extensive possible basis upon which to construe FTI's obligations under the contract.[3]  But New York does not require an extensive basis to find a contract enforceable; instead, the indefiniteness doctrine may be invoked only when there is no basis whatsoever to assign meaning to a term, producing such "impenetrable vagueness and uncertainty," *Joseph Martin, Jr., Delicatessen, Inc.*, 417 N.E. at 543, that "construction becomes futile," *Heyman Cohen & Sons*, 133 N.E. at 317.  That standard is not met here.  And because when it is not met courts "should endeavor to hold the parties to their bargain," *166 Mamaroneck Ave. Corp.*, 575 N.E.2d at 106, the Court will enforce the Letter of Engagement.

---

[3] In *Res Exhibit Services*, an extrinsic standard was found in the parties' two prior collaborations on trade show exhibits, 64 N.Y.S.3d at 792, whereas in this case only one prior transaction had occurred, *see* Arrowsmith Dep. Tr. at 12:13-13-9.  But in two respects the Letter of Engagement is more definite than the contract at issue in *Res Exhibit Services*.  First, in *Res Exhibit Services* the contract established that the plaintiff would be hired to provide exhibition services at industry trade shows, but it required the subsequent negotiation and execution of a Project Authorization Form to determine which exact services would be provided.  *Res Exhibit Servs.*, 64 N.Y.S.3d at 789.  By contrast, the Letter of Engagement provides an objective method for determining which specific services FTI would be obligated to provide—namely, those that Regional Health would direct it to provide, LOE § 2—and any possible indefiniteness could only lie in the characterization by Regional Health of the type of services directed.  Second, in *Res Exhibit Services* both the price and the scope of work were left to be determined, *Res Exhibit Servs.*, 64 N.Y.S.3d at 789, whereas the Letter of Engagement does include a price term, LOE § 3.  Thus, to construe the contract in *Res Exhibit Services* the court required an objective standard that could render definite the precise services the plaintiff was to provide and the price it would be paid, whereas to render the Letter of Engagement definite this Court requires only an objective standard that would identify which kinds of services fall within the general category of "Tenant/Operator transfer support" and "Restructuring Services."  And because this latter task requires less precision, a less extensive objective basis—such as one prior transaction rather than two—suffices.

Furthermore, the Court notes that in the context of this dispute between these parties, there is little risk that enforcing the Letter of Engagement will contravene the central value upheld by the doctrine of indefiniteness—namely, ensuring that the parties' obligations flow from their own agreement rather than being imposed by fiat by the Court.  *See, e.g.*, *Joseph Martin, Jr., Delicatessen*, *Inc.*, 417 N.E.2d at 543; Restatement (Second) of Contracts § 33 cmt. b. Indefiniteness may be a genuine concern when an allegedly indefinite term is itself at the core of the parties' dispute—for example, if Regional Health demanded particular services that it claimed, over FTI's objection, fell within the scope of tenant/operator transfer support.  For in order to resolve that dispute, the Court would be forced to determine the exact scope of the contractual term.  But neither FTI's nor Regional Health's allegations of breach of contract turn on the meaning of the terms used to define the scope of work.  FTI alleges that Regional Health breached the term requiring payment of fees.  *See* Compl. ¶ 21.  Regional Health's claims that FTI breached the contract do not turn on the definition of the allegedly indefinite terms but rather allege that FTI "simply abandoned performance of the contract and refused to make any additional efforts on behalf of Regional Health."  Am. Counterclaim ¶ 55.  Thus, to enforce the contract the Court will not need to assign a more definite meaning to those terms.  And if the Court does not interpret those terms at all, there is no chance that its interpretation will displace the parties' actual agreement in favor of its own conception of their bargain.  *See, e.g.*, Restatement (Second) of Contracts § 33 cmt. b ("Thus the degree of certainty required may be affected by the dispute which arises and by the remedy sought. . . .  It is less likely that a reasonably certain term will be supplied by construction as to a matter which has been the subject of controversy between the parties than as to one which is raised only as an afterthought.").

Second, the Court rejects Regional Health's argument that the Letter of Engagement is indefinite based on inconsistent characterizations of the scope of work, because those characterizations are perfectly consistent.  Regional Health claims that the obligation to provide "financial advisory and consulting services *only*," LOE § 2 (emphasis added), is inconsistent with the obligation to provide "Tenant/Operator transfer support," *id.  See* Deft. Opp. at 10.  But Regional Health's argument fails when the former provision is read in full context:

> FTI is engaged by [Regional Health] to provide financial advisory and consulting services only.  Accordingly, while [FTI] may from time to time suggest options which may be available to [Regional Health] and further give [FTI's] professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with [Regional Health], its management and board of directors.  FTI and its employees will not make any management decisions for [Regional Health] and will not be responsible for communicating information concerning [Regional Health] to the public, [Regional Health]'s shareholders or others.

LOE § 2.  As the remainder of the paragraph makes clear, the "only" in its first sentence indicates that FTI will consult with and provide financial advice to Regional Health but will not perform the services explicitly disclaimed in the final sentence—namely, making management decisions and communicating information to the public, shareholders, or others.  And this limitation makes perfect sense when read in conjunction with the provision that the services were to include "Tenant/Operator transfer support" and "Restructuring Services," *id.*: one provision specifies that FTI would provide only advice and consulting but would not actually make management decisions, and the other identifies the subjects—namely, tenant/operator transfer and restructuring—about which FTI would advise and consult.  Without any inconsistency between these provisions, they do not establish that the Letter of Engagement is too indefinite to enforce.

### b.  The Success Fee

The Letter of Engagement's fees provision reads: "FTI shall be entitled to a success fee in the amount of 7.5% of the collection of any now due or in the future due and/or past due lease

payments under the Wellington leases." LOE § 3. Regional Health argues that a number of terms in this provision are so indefinite that the contract cannot be enforced. First, Regional Health claims that "the most glaring failure in the LOE is its failure to define the term 'success fee'." Deft. Opp. at 11. And because the Letter of Engagement does not define "success fee," Regional Health argues, the Court cannot "look to the LOE to see what constitutes the success which entitles FTI to a fee," because "it is a term which, standing alone, is too vague to be enforced." *Id.* But while the Letter of Engagement may not provide an explicit definition of the term "success fee," the provision setting forth the fee does implicitly identify what constitutes success. As the term indicates, a success fee is a fee that must be paid only in the event of a success. And because the Letter of Engagement provides that the success fee is to be computed as a percentage of "the collection of any . . . lease payments under the Wellington leases," LOE § 3, by its terms the success fee will be paid only if any lease payments under the Wellington leases are collected. Since a success fee must be paid only in the event of success, and since the success fee required by the Letter of Engagement must be paid by computing the amount of lease payments collected, the Letter of Engagement implicitly identifies the collection of those payments as the success that triggers the obligation to pay. As would be expected, furthermore, the bigger the success—*i.e.*, the greater the value of the collections—the bigger the fee. Thus, because the Letter of Engagement implicitly defines what constitutes success, the term "success fee" is not so indefinite that the contract is unenforceable.

In its briefing, Regional Health cites to multiple excerpts from deposition transcripts in order to identify possible alternative meanings of "success." Deft. Opp. at 11. But under New York law, "evidence outside the four corners of the document . . . is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y.

2013); *see also Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 815-16 (2d Cir. 2014) ("In New York, '[i]t is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990))). And "where a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Schron*, 986 N.E.2d at 433-34 (internal quotation marks omitted). The Letter of Engagement contains a merger clause. *See* LOE § 4. And as discussed, the Letter of Engagement implicitly assigns a clear meaning to the term "success." Absent any ambiguity in "success" as used in the Letter of Engagement, then, the Court cannot consider deposition evidence in interpreting that term.

### c. The Wellington Leases

Next, Regional Health claims that the "failure to define the term 'Wellington leases' in the LOE is independently and fatally defective to the enforcement of the contract." Deft. Opp. at 12. The Court agrees that the Letter of Engagement does not itself define the term "Wellington leases." Thus, unlike with the term "success," extrinsic evidence may appropriately be considered in interpreting the meaning of the term "Wellington leases." *See Kass v. Kass,* 696 N.E.2d 174, 181 (N.Y. 1998) (finding proper the use of extrinsic evidence "to *resolve* any ambiguity in" a contractual term); *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) ("When the terms of a contract are ambiguous . . . a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties."). The available extrinsic evidence, however, reveals that the term "Wellington leases" has a clear and unambiguous meaning. For example, Morrison, the CEO of Regional Health, agreed that "Wellington leaseholds" referred to the Tara Sublease and the

Powder Springs Sublease when used in a contract Regional Health signed with Arrowsmith before he joined FTI.  Morrison Dep. Tr. at 31:16-21 ("Q.  It says 'Wellington leaseholds.'  What leaseholds is this referring to?  A.  The leaseholds that Wellington has for the company.  Q.  What were those leaseholds?  A.  Powder Springs and Tara.").  Indeed, Regional Health does not claim that the term "Wellington leases" remains ambiguous even once extrinsic evidence has been considered; rather, its briefing argues that "there is no way to read the four corners of the contract and know what is meant by the term 'Wellington leases'" while conceding that "the parties refer to [the Tara Sublease and the Powder Springs Sublease] as the Wellington leases."  Deft. Opp. at 12.  Since extrinsic evidence is admissible to resolve ambiguities in a contract, the Court may look beyond the four corners of the contract if Regional Health is correct that the Letter of Engagement leaves the meaning of "Wellington leases" ambiguous.  And since "the parties refer to [the Tara Sublease and the Powder Springs Sublease] as the Wellington leases," the extrinsic evidence establishes that the term "Wellington leases" refers to the Tara Sublease and the Powder Springs Sublease.

### d.  The Collecting Entity

Lastly, Regional Health argues that the Letter of Engagement's fees clause is indefinite because it "does not specifically identify who must collect those monies for FTI to collect a fee." Deft. Opp. at 13.  Certainly, Regional Health is correct that the fees clause includes no requirement that the collections be made by any particular entity in order for FTI to be owed a fee.  But this omission does not render the clause indefinite.  If the Letter of Engagement does not require that the collections be made by any entity in particular for FTI to earn a fee, then the plain terms of the contract obligate Regional Health to pay FTI a fee regardless of which entity actually makes the collection.  The fees clause instead limits the circumstances under which fees are due by requiring

that the collections must be "of any now due or in the future due and/or past due lease payments

under the Wellington leases." LOE § 3. Thus, FTI is owed a fee so long as such lease payments

are collected.[4] This meaning is more than adequately definite to permit the Court to enforce the

contract: so long as FTI can show that payments due under the Wellington leases were collected,

it may recover 7.5% of those payments as its fee.

### 2. FTI's Performance

The second element of breach of contract is the plaintiff's performance. *Markov*, 109

N.Y.S.3d at 296. Thus, to prevail FTI must show that it performed its obligations under the Letter

of Engagement. As discussed, FTI's primary obligation under the Letter of Engagement is laid

out in the clause entitled "Scope of Services":

> The Services, to be performed at [Regional Health's] direction, are expected to
> include the following:
>
> - Tenant/Operator transfer support;
> - Restructuring Services.

LOE § 2. This provision obligates FTI to provide the tenant/operator transfer support and the

restructuring services that Regional Health directs FTI to provide. In particular, that clause notes

that "FTI may be requested to assist [Regional Health] (and its legal or other advisors) in

negotiating with the [Regional Health]'s creditors and equity holders and with other interested

parties." *Id.* The record reflects numerous instances in which FTI negotiated with Andrews, the

President of Wellington Healthcare, at Regional Health's direction. *See* Morrison E-mail;

---

[4] As the Court will discuss *infra* at III.A.3.b, because the Wellington leases themselves require lease payments to be made to ADK, *see* Tara Sublease § 3; Powder Springs Sublease § 3, the phrase "lease payments under the Wellington leases" might be read to provide that only those collections received by ADK (or its designee) could be employed in computing FTI's fee. But this implicit specification of the entity that would receive collections renders even less plausible Regional Health's contention that in the absence of any explicit specification the Letter of Engagement is so indefinite that it cannot be enforced.

Arrowsmith Dep. Tr. at 58:23-59:6 ("Q.  Did you ever speak to Jeff Andrews personally?  A. Yeah.  Q.  On phonecalls with him?  A.  Yeah.  Q.  Do you recall roughly how many?  A.  I would say dozens, I'm not sure, but it was a lot."); Dkt. 31-3 ("Gordon Dep. Tr.") at 25:14-27:4.  And because these negotiations with Andrews were a form of tenant/operator transfer support performed at Regional Health's direction, they constitute FTI's performance under the contract.

Nonetheless, Regional Health argues that FTI "breached the terms of the Letter of Engagement" in two respects.  Am. Counterclaims ¶¶ 54, 55, 57.  First, it contends that "FTI simply abandoned performance of the contract and refused to make any additional efforts on behalf of Regional Health." *Id.* ¶ 55.  In particular, Regional Health claims that "Mr. Arrowsmith simply stopped assisting Regional Health despite FTI's agreement to provide 'Transfer/operator support.'"  Deft. Opp. at 23-24.  And it supports this allegation through evidence that Arrowsmith's involvement in the negotiations with Wellington declined substantially well before the negotiations were completed, at which point Regional Health's lawyer, Dave Gordon, took primary responsibility for negotiating the transition.  Deft. 56.1 Counter-Stmt. ¶¶ AF28-AF35; Dkt. 35 ("Morrison Declaration") ¶ 12; Arrowsmith Dep. Tr. at 73:5-7.  Thus, Regional Health concludes, FTI breached its obligation to provide tenant/operator transfer support because Arrowsmith ceased his involvement in the transfer prior to its consummation.

Regional Health's arguments fail to "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 248, however, because as a matter of law none of its alleged facts would constitute a breach of the Letter of Engagement.  As discussed, the Letter of Engagement provides that the services FTI was obligated to perform were "to be performed at [Regional Health's] direction."  LOE § 2.  This provision limits the services required of FTI under the contract: it did not need to provide all possible tenant/operator transfer support but rather only

that support that Regional Health directed it to provide.  Consequently, FTI would not have breached the contract unless it failed to provide services *that Regional Health directed it to provide*.  And Regional Health's allegations that Arrowsmith ceased communicating or otherwise participating in negotiations with Andrews would establish a breach of contract only if Regional Health had directed Arrowsmith to engage in further communications or negotiations.  It is undisputed, however, that Regional Health gave no such direction: Regional Health's own CEO testified that there was never "a situation that [he] recall[ed] where [he] asked Rick Arrowsmith to do something and [Arrowsmith] refused."  Morrison Dep. Tr. at 108:19-22; Gordon Dep. Tr. 31:18-32:3 ("Q.  Did you ever ask Rick Arrowsmith to assist in some way and have him say, 'No, I am not willing to help?'  A.  No.  That never happened.  Q.  Did Rick . . . Arrowsmith [] ever refuse to provide advice in connection with this transaction?  A.  No, not to my knowledge.  Q. Now, . . . did Rick Arrowsmith ever quit the job?  A.  No, not to my knowledge.").  And because Regional Health never directed Arrowsmith or FTI to further engage in negotiations, their "not inquiring, not participating in the negotiations," Morrison Dep. Tr. at 108:12-13, cannot amount to a breach of contract.

Second, Regional Health alleges that "FTI's conduct was also a breach of the implied covenant of good faith and fair dealing."  Am. Counterclaim ¶ 57.  Under New York law, however, this implied covenant "does not create any new contractual rights."  *Village On Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 534 (S.D.N.Y. 1996).  Rather, it "can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties."  *Broder v. Cablevision Sys. Corp*, 418 F.3d 187, 198-99 (2d Cir. 2005) (citation, brackets, and internal quotation marks omitted).  Thus, "breach of that duty is merely a breach of the underlying contract."  *Fasolino Foods Co., Inc. v. Banca*

*Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotation marks omitted). Because the implied covenant does not create any new contractual rights, it cannot obligate FTI to render a performance that was not required by any of the contract's substantive provisions.  In particular, the implied duty of good faith and fair dealing must be "consistent with other mutually agreed upon terms in the contract," *Broder*, 418 F.3d at 198, including the provision that FTI's services were "to be performed at [Regional Health's] direction," LOE § 2.  And since that term relieved FTI of the obligation to perform any services that Regional Health did not direct it to provide, the implied duty of good faith and fair dealing cannot on its own impose that obligation, either.

The Letter of Engagement obligated FTI to provide consultation and advice, when directed by Regional Health, concerning restructuring and tenant/operator transfer.  Arrowsmith provided all the consulting and advice on those subjects he was directed to provide.  Thus, FTI performed under the Letter of Engagement.

### 3.  Regional Health's Breach

The Letter of Engagement obligated Regional Health to pay "a success fee in the amount of 7.5% of the collection of any now due or in the future due and/or past due lease payments under the Wellington leases" (the "Fee Clause").  LOE § 3.  It is undisputed that "the aggregate cash collected" is $3,123,583.18.  Pl. 56.1 Stmt. ¶ 27; Deft. 56.1 Counter-Stmt. ¶ 27.  FTI claims that this cash constitutes "now due or in the future due and/or past due lease payments under the Wellington leases," and that Regional Health therefore breached the Fee Clause by failing to pay it a success fee of $234,268.74, which is equal to 7.5% of the aggregate cash collected.  Dkt. 33 ("Pl. Brief") at 11.  Regional Health argues that, for three reasons, the Letter of Engagement does not obligate it to make that payment, and thus that its failure to make it does not constitute breach

of the Fee Clause: (1) the cash collected was not a recovery under a lease, Deft. Opp. at 14-15, (2) the cash was collected by ADK rather than Regional Health, *id.* at 15-17, and (3) FTI was not responsible for a success, *id.* at 17-20.[5]  Because the cash collected does satisfy the description set forth in the Fee Clause, and because that clause imposes no additional conditions that must be met for FTI to be owed its fee, the Court finds that Regional Health breached the Letter of Engagement.

### a. Lease Payments

The LOE's Fee Clause provides that FTI is owed "a success fee in the amount of 7.5% of the collection of any now due or in the future due and/or past due lease payments under the Wellington leases."  LOE § 3.  Thus, whether a fee is owed depends on whether there has been a "collection of any now due or in the future due and/or past due lease payments under the Wellington leases."  Because it is undisputed that funds were collected from the Wellington Tenants, the dispute between the parties turns on whether those funds satisfy the description set forth in the Fee Clause of the collections upon which FTI's fee would be based.  Thus, the Court

---

[5] As noted, on April 15, 2021, Regional Health paid FTI $83,841.00. Pl. 56.1 Stmt. ¶ 39. That sum represented 7.5% of what Regional Health then believed to be its "collections" under the Letter of Engagement, which it computed as the cash collected minus Regional Health's legal fees and the bed tax liability. *Id.*; Waites Dep. Tr. at 21:22-22:6.  Thus, prior to litigation, Regional Health apparently did not deny that it had an obligation under the Letter of Engagement to pay FTI a fee; instead, it simply disputed FTI's methodology for calculating the amount of that fee. *See, e.g.*, Pl. 56.1 Stmt. ¶¶ 33-38.  FTI's summary judgment briefing devotes considerable space to defending its methodology for computing the fee.  Pl. Brief at 11-14.  Nonetheless, Regional Health now avers that this dispute over the methodology for computing the fee is an "irrelevant red herring," Deft. Opp. at 15, and instead argues only that the Letter of Engagement requires no payment at all.  Consequently, because Regional Health did not address FTI's arguments in its brief defending its method for computing its fee, the Court will not consider the argument that Regional Health's prior method of computing the fee was correct, and thus that its obligation is limited to the payment it has already tendered to FTI. *See, e.g.*, *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) (holding that a party's failure to address an argument in its opposition papers "operates as an abandonment of the argument").

must determine whether the collections from the Wellington Tenants qualify as "the collection of any now due or in the future due and/or past due lease payments under the Wellington leases."

In Regional Health's view, FTI cannot be entitled to any fee because the amounts collected "were not money paid under any lease" but were "instead paid under a different contract, the Agreement Regarding Leases." Deft. Opp. at 14. Thus, Regional Health appears to interpret a collection of funds to fall within the description in the Fee Clause only if those funds were paid pursuant to a lease agreement, rather than pursuant to some other agreement. This interpretation, however, is flatly inconsistent with the text of the Fee Clause. In Regional Health's view, FTI's fee should be computed based on payments *made* under the lease. But the Fee Clause instead speaks of payments *due* under the lease, as it applies to "collection of any *now due or in the future due and/or past due* lease payments under the Wellington leases." LOE § 3 (emphasis added). Thus, the fact that the Wellington Tenants made payments or transferred assets pursuant to the Agreement Regarding Leases does not in itself take those payments outside the scope of the Fee Clause, for even if the payments were *made* pursuant to the Agreement Regarding Leases, those payments may have been *due* under the Wellington leases. What matters is not whether collections were received pursuant to some agreement besides the Tara Sublease and the Powder Springs Sublease but rather whether the collections received constituted the lease payments that were due (now or in the future) or past due under the Tara Sublease and the Powder Springs Sublease.

FTI, in turn, argues that "collections in settlement of defaulted lease payments qualify under the broad category of 'future due and/or past due lease payments.'" Pl. Reply at 7. The Court agrees. In such a settlement, the party owing the payments due under the lease agrees to make a payment or transfer of assets, and in exchange the party to whom those payments are owed agrees to give up its claims to payment under the lease. The Agreement Regarding Leases

27

conformed to this pattern: in exchange for the Wellington Tenants' transfers of cash and accounts receivable to ADK, *see* Agreement Regarding Leases § 4, ADK agreed to "forbear pursuit of its rights and remedies under the Leases," including its right to pursue the lease payments due under the leases, *see id.* at § 8.  Once the Agreement Regarding Leases had been carried out, ADK was no longer legally able to recover the payments due under the leases because of commitments it undertook in that agreement.  The collection received under the Agreement Regarding Leases constituted a collection of payments due under the lease, then, and not an independent obligation or a collection of some other payment, because once the collection had been received there remained no further payment due under the lease—those collections satisfied the Wellington Tenants' outstanding obligations under the leases.  *See* Morrison Dep. Tr. at 59:9-11 ("[W]e elected to take ownership of all of the accounts receivable that Powder Springs and Tara had in lieu of rent payments."); *id*. at 88:20-89:11 ("Q.  [A]ny assets that were on hand, cash, accounts receivable, at the two facilities were going to be transferred to ADK Georgia. . . .  And that was to settle the default on the rent obligation.  Is that correct?  A.  Correct.").  ADK must have collected the payments due under the leases in the settlement, because after the settlement no such payments remained to be collected.  Furthermore, this construal of the Agreement Regarding Leases is confirmed by the text of the agreement itself, which recites that "the Parties now wish to resolve the disputes and differences between them arising in connection with Tenants' default under the Leases."  Agreement Regarding Leases at 2.  Consequently, collections received pursuant to the Agreement Regarding Leases qualify as "the collection of any now due or in the future due and/or past due lease payments under the Wellington Leases," and thus must be employed in computing FTI's fee.  LOE § 3.

### b.  The Collecting Entity

Regional Health's first argument for why it owes FTI no fee under the Letter of Engagement did correctly identify a requirement found within the agreement; the argument failed only because Regional Health is incorrect that the collections received do not satisfy that requirement.  By contrast, Regional Health's remaining arguments fail because they rely on purported requirements not actually imposed by the contract.  First, Regional Health argues that "since the only other party to the contract is Regional Health it is a reasonable inference that the collections must be by Regional Health for FTI to earn a fee."  Deft. Opp. at 15.  Since all funds collected under the Agreement Regarding Leases were collected by ADK, Regional Health's subsidiary, *see* Agreement Regarding Leases § 4, Regional Health concludes that there have been no collections satisfying the description in the Fee Clause, and thus that FTI is owed no fee.  Deft. Opp. at 15-16.

As the Court has explained, though, *see supra* III.A.1.d, the Letter of Engagement simply does not impose any requirement that the collections be made by Regional Health for FTI's fee to be due.  The Fee Clause imposes a single test to determine whether a collection should be employed to compute FTI's fee: it must be a collection of "now due or in the future due and/or past due lease payments under the Wellington leases."  LOE § 3.  So long as that description is satisfied, the contract imposes no additional requirements.  Regional Health suggests that FTI's interpretation of the Letter of Engagement would be justified only if the agreement specifically provided that collections made by Regional Health's subsidiaries could be employed in computing FTI's fee.  Deft. Opp. at 16.  But Regional Health cites no authority for why the Letter of Engagement needed to have an additional specific authorization to count collections made by subsidiaries when such collections are already encompassed by the plain terms of the contract.  The fees due FTI are equal

to 7.5% of "the collection of any now due or in the future due and/or past due lease payments under the Wellington leases." LOE § 3.  Thus, so long as a collection satisfies that description, it must be employed in computing FTI's fee.  Regional Health has not, and cannot, identify a portion of that clause requiring the collections to be made by a particular entity—as the clause plainly does not have such a requirement.  FTI's fee therefore may be based on collections received by any entity, including ADK, so long as they are collections of "any now due or in the future due and/or past due lease payments under the Wellington leases." *Id.*

Indeed, if anything the Fees Clause would suggest that collections were expected to be made by ADK, not by Regional Health.  As discussed, the Fees Clause permits a collection of funds to be employed in computing FTI's fee only if that collection is of payments due under the Wellington leases.  And those leases imposed the obligation to make rent payments *to ADK in particular.*  Tara Sublease § 3; Powder Springs Sublease § 3.  As the Court has discussed, *see supra* III.A.3.a, a collection satisfies the definition set forth in the Fee Clause only if it satisfies an obligation to make payment under the lease.  And a rent payment under the Wellington leases could only satisfy such an obligation if it was made *to ADK* (or to ADK's designee).  Thus, if funds were collected by some entity other than ADK, it is difficult to see how they could qualify under the Fee Clause to be employed in computing FTI's fee, since (absent further agreement from ADK) those collections could not pay the outstanding obligations under the Tara Sublease or Powder Springs Sublease unless they were paid to ADK.  In order to resolve the dispute between the parties, the Court need not determine whether the Letter of Engagement in fact requires collections to be made only by ADK in order to be employed in computing FTI's fee, since no entity besides ADK has received collections under the Agreement Regarding Leases.  But the plausibility of the argument that the Letter of Engagement does impose such a requirement makes

particularly implausible Regional Health's argument that only Regional Health's own collections may be used in computing FTI's fee.

Finally, contrary to Regional Health's suggestion, there is no basis to infer from the signatories of the Letter of Engagement that collections must be made by Regional Health for a fee to be due.  The fact that Regional Health rather than ADK signed the contract is wholly irrelevant: New York generally permits parties to freely undertake whichever obligations they choose, including obligations to make payments based on contingencies affecting third parties. *See generally 159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 132-33 (N.Y. 2019) (discussing New York's strong public policy favoring freedom of contract).  And because payments to ADK ultimately redound to the benefit of Regional Health, which fully owns ADK, Regional Health's obligation to pay compensation if ADK succeeds in collecting monies owed is commercially reasonable.  *Cf.* Morrison Dep. Tr. at 52:7-9 ("Q.  So the parent company pays the bills on behalf of ADK Georgia.  Is that fair?  A.  Sure.").  Thus, the Court holds that the Fee Clause does not require payments to be collected by any entity in particular, such as Regional Health, in order to be used in computing FTI's fee.

### c.  Earning a Success

Finally, Regional Health argues that FTI is owed no fee under the Fee Clause because it did not "earn[] a success."  Deft. Opp. at 18.  In particular, Regional Health presents a number of reasons why no success should be credited to FTI.  First, it argues, citing parol evidence, that success under the Letter of Engagement requires "the successful transfer of operations of the ADK Georgia subleases, not generally, but specifically to American Home Properties."  *Id.* at 18-19. Second, it argues that FTI did not *earn* any success because FTI's services failed to cause the successful resolution of the dispute between Regional Health and Wellington.  *Id.* at 18.  Third, it

argues that FTI did not earn the success because Regional Health's lawyer drafted and negotiated the terms of the agreements through which the dispute was resolved, and thus that lawyer, not FTI, was responsible for the successful resolution of the dispute between Regional Health and Wellington. *Id.* at 19.

But regardless of whether FTI did "earn[] a success" in the sense used by Regional Health, these arguments all fail because Regional Health has not shown that the Letter of Engagement requires FTI to "earn[] a success" in order for its fee to be due.  The Letter of Engagement sets forth two primary promises, one made by each party: in section 2 it obligates FTI to provide consulting and advisory services, LOE § 2, and in section 3 it obligates Regional Health to pay "a success fee in the amount of 7.5% of the collection of any now due or in the future due and/or past due lease payments under the Wellington leases," *id.* § 3.  The language of the success fee is mandatory, providing simply that "FTI shall be entitled to" the fee.  It contains no further conditions that must be met before the fee is due—no condition that the Wellington Facilities be transferred to any particular operator, no condition that FTI's services be causally responsible for the transfer, and no condition that no other professional's services be responsible for the transfer. And because the contract does not contain any such conditions, Regional Health's obligation to pay the fee would not be relieved even were none of those conditions met.

Furthermore, the Letter of Engagement contains a merger clause specifically providing that the contract "exclu[des] any other express or implied terms . . . including any conditions." *Id.* § 4. And "where a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing."  *Schron*, 986 N.E.2d at 433-34 (internal quotation marks omitted). Because reading the Letter of Engagement to impose additional conditions that FTI must meet in

order be owed a fee would "vary . . . the terms of the writing," the Court cannot rely on the extrinsic evidence that Regional Health has submitted in order to read any additional conditions into the contract.[6]

Instead, because the text of the Fee Clause plainly states that FTI "shall be entitled to" a success fee in a specified amount, Regional Health is obligated to pay a sum computed using the method set forth in the Fee Clause. The total collections received under the Agreement Regarding Leases are $3,123,583.18, and 7.5% of that amount is $234,268.74.[7] Because Regional Health has not paid FTI that sum of money, it has breached the Letter of Engagement.

### 4. Damages

The final element of FTI's claim for breach of contract cannot reasonably disputed. By paying FTI $83,841.00 rather than $234,268.74, Regional Health caused damage to FTI in the amount of the difference between the payment owed and the payment made—namely, $150,427.72.

---

[6] To be sure, New York will sometimes enforce a collateral oral agreement that imposes a condition precedent to a duty under a written contract. *See Hicks v. Bush*, 180 N.E.2d 425, 427 (N.Y. 1962). *But see Torres v. D'Alesso*, 910 N.Y.S.2d 1, 3 (App. Div. 2010) (refusing to allow evidence of a collateral oral agreement creating a condition precedent when the written contract was for the sale of real estate and contained a merger clause). But such conditions precedent must be imposed by an independent oral agreement. *E.g.*, *Hicks*, 180 N.E.2d at 428 (finding that "it was [the parties'] desire and understanding that . . . the writing was not to become operative as a contract . . . until $672,500 was raised," because "ample proof attesting to the making of the oral agreement" had been introduced). And although Regional Health's evidence may show that the parties initially contemplated that the Wellington facilities would be transferred to American Health Properties, none of Regional Health's evidence shows a separate oral agreement that the identity of the transferor would be a condition precedent to Regional Health's obligation to pay a fee under the Letter of Engagement. *See* Deft. 56.1 Counter-Stmt. ¶¶ AF7-AF9.

[7] As noted, *see supra* note 5, Regional Health now dismisses as "an irrelevant red herring," Deft. Opp. at 15, its previous argument that FTI's fee should be computed based on the cash collected under the Agreement Regarding Leases only after certain expenses are deducted.

**B. Regional Health's Affirmative Defenses and Counterclaims**

For the most part, Regional Health's affirmative defenses and counterclaims turn on the same legal and factual issues as FTI's claim for breach of contract. Thus, the Court's holding that FTI has proven all the elements of its claim requires the Court to reject Regional Health's affirmative defenses and counterclaims. The Court will address each in turn.

### 1. Regional Health's First Affirmative Defense

Regional Health's first affirmative defense asserts that "Plaintiff's Complaint fails to state a claim upon which relief may be granted." Answer at 1. Under Rule 12 of the Federal Rules of Civil Procedure, a motion asserting the failure to state a claim upon which relief can be granted must be made "before pleading if a responsive pleading is allowed," not in that pleading. Fed. R. Civ. P. 12(b). And, in any event, Plaintiff's Complaint adequately pleads the elements of breach of contract—elements that it has now proven. Thus, Regional Health's first affirmative defense fails.

### 2. Regional Health's Second Affirmative Defense

Regional Health's second affirmative defense asserts that "Plaintiff's claims are barred as the contract at issue is void for vagueness and is too indefinite to be enforced." Answer at 1. The Court has already held that the Letter of Engagement is enforceable. *See supra* III.A.1. Thus, Regional Health's second affirmative defense fails.

### 3. Regional Health's Third Affirmative Defense

Regional Health's third affirmative defense simply repeats its second, stating that "Plaintiff's claims are barred as the contract at issue is ambiguous and therefore unenforceable." Answer at 1. Thus, its third affirmative defense fails for the same reason as its second.

### 4. Regional Health's Fourth Affirmative Defense

Regional Health's fourth affirmative defense asserts that "Plaintiff's claims are barred as Plaintiff was the first party to breach the contract and therefore may not assert a breach of contract claim." *Id.*  The Court has already held that FTI did not breach the contract. *See supra* III.A.2. Thus, Regional Health's fourth affirmative defense fails.

### 5. Regional Health's Fifth Affirmative Defense

Regional Health's fifth affirmative defense asserts that "Plaintiff is estopped from pursuing its claim based on its conduct, which affirmed the parties were no longer acting in accordance with the contract." Answer at 2.  Under New York law, "estoppel rests on the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269 (N.Y. 1982) (internal quotation marks omitted).  Regional Health has not introduced any evidence that it relied on the alleged conduct through which it contends FTI affirmed that the parties were no longer acting in accordance with the contract, nor has Regional Health introduced evidence of how it changed its position to its injury as a result of that reliance.  Consequently, Regional Health's fifth affirmative defense fails.

### 6. Regional Health's Sixth Affirmative Defense

Regional Health's sixth affirmative defense asserts that "Plaintiff's claims are barred by the doctrine of waiver."  Answer at 2.  Under New York law, "waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *City of New York v. New York*, 357 N.E.2d 988, 995 (N.Y. 1976) (internal quotation marks omitted).  Regional Health has not introduced any evidence showing that FTI intended to relinquish its right to compensation under the Letter of Engagement, and indeed the evidence

submitted reflects FTI's clear intention to receive that compensation. *See, e.g.*, Pl. 56.1 Stmt. ¶¶ 30-38. Thus, Regional Health's sixth affirmative defense fails.

### 7. Regional Health's Seventh Affirmative Defense

Regional Health's seventh affirmative defense asserts that "Plaintiff may not succeed on its breach of contract claims based on the failure of the anticipated consideration." Answer at 2. Under New York law, the doctrine of failure of consideration allows a party to rescind a contract if it "fails without [its] fault to receive in some material respect the agreed quid pro quo for [its] performance." *Fugelsang v. Fugelsang*, 517 N.Y.S.2d 176, 177 (App. Div. 1987). As the Court has explained, the Letter of Engagement contemplated a quid pro quo in which FTI would provide the consulting and advisory services Regional Health directed it to provide. And FTI provided all such services. Thus, Regional Health has received "the agreed quid pro quo for [its] performance." Perhaps Regional Health now believes that what bargained for in the Letter of Engagement was not worth what it paid. But "courts do not inquire into the adequacy of consideration; as long as a contract provides some consideration, even a peppercorn, it is enough in the eyes of the law." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 500 (S.D.N.Y. 2022) (internal quotation marks omitted). Regional Health's seventh affirmative defense therefore fails.

### 8. Regional Health's Eighth Affirmative Defense

Regional Health's eighth affirmative defense asserts that "Plaintiff has failed to meet conditions precedent necessary for it to recover under the contract at issue. Specifically, Plaintiff undertook no work which resulted in Plaintiff [sic] receiving any money." Answer at 2. As the Court has explained, however, the Letter of Engagement does not contain a condition precedent to the payment of FTI's fee requiring the services FTI provided to have been the cause of Regional

Health's collection of payments due under the Wellington leases.  *See supra* III.A.3.c.  Thus, Regional Health's eighth affirmative defense fails.

### 9.  Regional Health's First and Second Counterclaims

Regional Health's first and second counterclaims each seek reimbursement of its April 15, 2021 payment to FTI on the grounds of unjust enrichment.  Am. Counterclaims ¶¶ 35-52.  These counterclaims, however, presuppose the invalidity of the Letter of Engagement, since unjust enrichment "is an obligation the law creates in the absence of any agreement."  *See, e.g.*, *Goldman v. Metro. Life. Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005).  When a valid and binding contract instead exists, New York law does not permit an action for unjust enrichment.  *Id.* ("Here, in each case, there was no unjust enrichment because the matter is controlled by contract.").  Thus, Regional Health's first and second counterclaims fail.

### 10.  Regional Health's Third and Fourth Counterclaims

Regional Health's third and fourth counterclaims each assert that FTI breached the Letter of Engagement, then seek damages and rescission, respectively, as remedies for that breach.  Am. Counterclaims ¶¶ 53-69.  FTI's performance under the contract was an element of its own claim for breach of contract, however, and the Court has already held that FTI did not breach the Letter of Engagement.  *See supra* III.A.2.  Thus, Regional Health's third and fourth counterclaims fail.

### IV.  Conclusion

For the foregoing reasons, FTI's motion for summary judgment is granted with respect both to its single cause of action and to Regional Health's four counterclaims.  That motion having been granted, FTI's motion to strike Regional Health's counterclaim for attorneys' fees, Dkt. 21, is denied as moot.  Regional Health must pay FTI the balance of the success fee due under the Letter of Engagement, an amount of $150,427.74.  In addition, New York law awards interest to

successful plaintiffs in actions for breach of contract, N.Y. C.P.L.R. § 5001(a), computed from the "earliest ascertainable date the cause of action existed," *id.* § 5001(b).  Because Regional Health breached the Letter of Engagement by failing to pay the entire fee due to FTI, FTI is owed pre-judgment interest from the date upon which Regional Health refused to pay the fee in full. Regional Health clearly expressed its refusal to pay the fee in full by paying it only in part on April 15, 2021.  Pl. Brief at 23.  Thus, FTI is owed interest on the unpaid $150,427.74 of its fee for the period from April 15, 2021 until the date of this judgment.  By statute, New York imposes a rate of interest of 9% per annum.  N.Y. C.P.L.R. § 5004(a).

The Clerk of the Court is respectfully requested to close the motions pending at Docket Numbers 21 and 30, to enter judgment in favor of Plaintiff FTI Consulting, Inc. in the amount of $150,427.74 plus prejudgment interest accruing from April 15, 2021 until the date of this judgment, computed at the statutory 9% rate, and to close the case.

SO ORDERED.

Dated:  September 30, 2022
      New York, New York

_____
JOHN P. CRONAN
United States District Judge